# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2022

Lyle W. Cayce
Clerk

No. 19-60699

Santiago Alejandro Diaz Esparza,

*Petitioner,*

*versus*

Merrick Garland, U.S. Attorney General,

*Respondent.*

On Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A096 567 521

Before Owen, *Chief Judge*, and Clement and Higginson, *Circuit Judges*.

Priscilla R. Owen, *Chief Judge*:

Santiago Alejandro Diaz Esparza seeks review of a Board of Immigration Appeals (BIA) decision finding him subject to removal under 8 U.S.C. § 1227(a)(2)(A)(ii), which permits the deportation of aliens who commit two crimes involving moral turpitude (CIMTs) after admission to

the United States.[1]  Diaz Esparza argues that this court should vacate the BIA's decision because res judicata bars the removal proceedings against him, he has not been convicted of two CIMTs, and his convictions did not occur after admission.  For the reasons that follow, Diaz Esparza's arguments are unavailing, and we dismiss his petition for review.

# I

Diaz Esparza, a native and citizen of Mexico, entered the United States without inspection in 1999.  He adjusted his status to that of a lawful permanent resident in 2005.  In 2013, Diaz Esparza was convicted of deadly conduct in violation of Texas Penal Code section 22.05(a).  In 2014, Diaz Esparza was convicted of evading arrest with a motor vehicle in violation of Texas Penal Code section 38.04.

The following year, the Department of Homeland Security (DHS) served Diaz Esparza with a notice to appear, charging him with removability under 8 U.S.C. § 1227(a)(2)(A)(iii).  Section 1227(a)(2)(A)(iii) renders "deportable" aliens convicted of aggravated felonies after being admitted to this country.[2]  Finding that Diaz Esparza's conviction for evading arrest constituted an aggravated felony, the immigration judge (IJ) sustained the charge of removability and ordered Diaz Esparza's removal.  The BIA dismissed Diaz Esparza's appeal, and this court denied his petition for review.[3]  However, the Supreme Court granted certiorari, vacated this court's judgment, and remanded the case back to us for additional consideration in light of *Sessions v. Dimaya*, which held a portion of the

---

[1] *See* 8 U.S.C. § 1227(a)(2)(A)(ii).

[2] 8 U.S.C. § 1227(a)(2)(A)(iii).

[3] *See Diaz-Esparza v. Sessions*, 697 F. App'x 338 (5th Cir. 2017) (per curiam), *cert. granted*, *vacated*, 138 S. Ct. 1986 (2018) (mem.).

statutory definition of "aggravated felony" unconstitutionally vague.[4] We remanded the case to the BIA, and the BIA terminated the removal proceedings because Diaz Esparza was not removable as charged under *Dimaya*.

In 2019, DHS served Diaz Esparza with a second notice to appear, this time charging him with removability under 8 U.S.C. § 1227(a)(2)(A)(ii). Section 1227(a)(2)(A)(ii) provides that "[a]ny alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct . . . is deportable."[5] Diaz Esparza filed a motion to terminate the proceedings. The IJ conducted a hearing, sustained the charge of removability, and denied the motion to terminate. Diaz Esparza appealed, but the BIA affirmed the IJ's decision and dismissed the appeal. Diaz Esparza then filed a timely petition for review with this court.

## II

We first address Diaz Esparza's arguments regarding res judicata. "The doctrine of res judicata applies to administrative adjudications in the immigration context," and "[t]he res judicata effect of a prior judgment is a legal question that we review de novo."[6]

Diaz Esparza contends that res judicata bars the present removal proceedings. Specifically, he asserts that because his conviction for evading

---

[4] *Sessions v. Dimaya*, ___U.S.___, 138 S. Ct. 1204, 1210-11 (2018); *see Diaz-Esparza*, 138 S. Ct. at 1986.

[5] 8 U.S.C. § 1227(a)(2)(A)(ii).

[6] *Chavez-Mercado v. Barr*, 946 F.3d 272, 275 (5th Cir. 2020) (internal citation omitted).

No. 19-60699

arrest was the basis of a prior proceeding under § 1227(a)(2)(A)(iii), this conviction cannot now support removal under § 1227(a)(2)(A)(ii).

Our precedent forecloses this argument. In *Peters v. Ashcroft*, we held that res judicata does not bar a subsequent removal proceeding based on a conviction that also supported a prior terminated removal proceeding, so long as the two proceedings occur pursuant to distinct statutory provisions.[7] In other words, even when the "second removability charge [is] based on the same underlying . . . offense as the first," "so long as the Government relied on a different provision the second time around, res judicata is no bar."[8] We have reaffirmed this principle on multiple occasions.[9]

Accordingly, "the BIA's prior decision" that Diaz Esparza was not removable "has no res judicata effect on the current removal proceeding," which "is based on a wholly separate provision."[10] Although both removal proceedings against Diaz Esparza rely on his conviction for evading arrest, the second removability charge is based on § 1227(a)(2)(A)(ii)—requiring conviction of two or more CIMTs—whereas the first removability charge

---

[7] *See Peters v. Ashcroft*, 383 F.3d 302, 304, 305 n.2 (5th Cir. 2004).

[8] *Cruz Rodriguez v. Garland*, 993 F.3d 340, 344 (5th Cir. 2021) (per curiam).

[9] *See id.* at 344-45; *Chavez-Mercado*, 946 F.3d at 276 (noting that "we have found res judicata inapplicable where subsequent removal proceedings were brought under a different statutory provision" (citing *Peters*, 383 F.3d at 305 n.2)); *see also Diaz De Leon-Munoz v. Holder*, 395 F. App'x 139, 139-140 (5th Cir. 2010) (per curiam) (holding res judicata inapplicable "because 'the current removal proceeding pending against [the petitioner] is based on a wholly separate provision' than the prior removal proceeding" (quoting *Peters*, 383 F.3d at 305 n.2)); *Maringo v. Holder*, 364 F. App'x 903, 905-06 (5th Cir. 2010) (per curiam) (holding that res judicata did not bar removal when "the current basis for [the petitioner's] removal . . . is a separate provision from the charge in the first proceeding," even though "the INS had the opportunity to charge him with the instant violation in the previous removal proceedings that were terminated in his favor").

[10] *Peters*, 383 F.3d at 305 n.2.

No. 19-60699

was based on § 1227(a)(2)(A)(iii)—requiring conviction of an aggravated felony.[11]  Because each proceeding has a distinct statutory basis, res judicata does not bar the present proceeding.[12]

## III

Diaz Esparza also contends that he does not meet the statutory requirements for deportation because he has not been convicted of two CIMTs after admission to the United States, as required by § 1227(a)(2)(A)(ii).[13]

## A

First, Diaz Esparza asserts that his conviction for deadly conduct is not a CIMT, so he has not been convicted of two CIMTs.

The Immigration and Nationality Act "does not define the term moral turpitude and legislative history does not reveal congressional intent regarding which crimes are turpitudinous.  Instead, Congress left the interpretation of this provision to the BIA and interpretation of its application to state and federal laws to the federal courts."[14]  When determining whether an offense is a CIMT, this court thus affords "*Chevron* deference to the BIA's interpretation of the term 'moral turpitude' and its guidance on the

---

[11] *See* 8 U.S.C. §§ 1227(a)(2)(A)(ii), (iii).

[12] *See Peters*, 383 F.3d at 305 n.2; *Cruz Rodriguez*, 993 F.3d at 344; *Chavez-Mercado*, 946 F.3d at 276.

[13] *See* 8 U.S.C. § 1227(a)(2)(A)(ii).

[14] *Munoz-Rivera v. Wilkinson*, 986 F.3d 587, 590 (5th Cir. 2021) (per curiam) (internal quotation marks omitted) (quoting *Rodriguez-Castro v. Gonzales*, 427 F.3d 316, 319-20 (5th Cir. 2005)).

general categories of offenses which constitute CIMTs."[15]  However, we review de novo whether a particular offense qualifies as a crime of moral turpitude.[16]

> According to the BIA, moral turpitude refers to:

> conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.  Moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong, or *malum in se*, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude. Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.[17]

Moreover, the BIA has observed that "moral turpitude is intrinsic to an offense that necessarily involves 'reprehensible conduct' committed with some form of 'scienter,' such as specific intent, knowledge, willfulness, or recklessness."[18]

When analyzing whether a given crime satisfies the BIA's definition of a CIMT, this court employs a "categorical approach."[19]  This analysis "focuses on the inherent nature of the crime, as defined in the statute . . .

---

[15] *Villegas-Sarabia v. Sessions*, 874 F.3d 871, 877 (5th Cir. 2017) (quoting *Esparza-Rodriguez v. Holder*, 699 F.3d 821, 823 (5th Cir. 2012)).

[16] *See Mercado v. Lynch*, 823 F.3d 276, 278 (5th Cir. 2016) (per curiam).

[17] *Villegas-Sarabia*, 874 F.3d at 877-78 (quoting *Hyder v. Keisler*, 506 F.3d 388, 391 (5th Cir. 2007)).

[18] *Matter of Leal*, 26 I. & N. Dec. 20, 21 (BIA 2012).

[19] *Villegas-Sarabia*, 874 F.3d at 877.

No. 19-60699

rather than the circumstances surrounding the particular transgression."[20] Under the categorical approach, "the statute must be read as the minimum criminal conduct necessary to sustain a conviction."[21]

Texas law defines deadly conduct as "recklessly engag[ing] in conduct that places another in imminent danger of serious bodily injury."[22] An individual acts recklessly when "he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances [surrounding his conduct] exist or the result [of his conduct] will occur."[23] "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."[24]

**1**

Diaz Esparza argues that deadly conduct cannot be a CIMT because under this court's decision in *Gomez-Perez v. Lynch*, CIMTs require a mens rea more culpable than recklessness. *Gomez-Perez* held that misdemeanor assault—a violation of Texas Penal Code section 22.01(a)(1)—was not a CIMT.[25] In that case, "[b]oth sides agree[d] that the Texas assault statute viewed as a whole does not qualify as a [CIMT] because it applies to acts that

---

[20] *Munoz-Rivera v. Wilkinson*, 986 F.3d 587, 591 (5th Cir. 2021) (quoting *Villegas-Sarabia*, 874 F.3d at 877).

[21] *Id.*

[22] TEX. PENAL CODE § 22.05(a).

[23] TEX. PENAL CODE § 6.03(c).

[24] TEX. PENAL CODE § 1.07(a)(46).

[25] *See Gomez-Perez v. Lynch*, 829 F.3d 323, 325, 327-28 (5th Cir. 2016).

No. 19-60699

are not intentional."[26]  Consequently, the central question in *Gomez-Perez* was whether the assault statute was divisible, such that we could apply the "'modified categorical approach' to determine if the offense involved the intentional conduct that would qualify as a crime of moral turpitude."[27] Concluding that the statute was not divisible, we held that "Texas's assault statute can be committed by mere reckless conduct and thus does not qualify as a crime involving moral turpitude, which requires a more culpable mental state."[28]

*Gomez-Perez*, however, is distinguishable.  That case dealt with misdemeanor assault, which encompasses "relatively minor physical contacts."[29]  Deadly conduct, however, requires "imminent danger of serious bodily injury,"[30] i.e., "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."[31] Although both crimes are assaultive offenses,[32] deadly conduct entails a much greater degree of potential physical harm than misdemeanor assault.

---

[26] *Id.* at 325; *see also id.* at 328 (returning to "the general categorical inquiry about which the parties, the immigration judge, and the Board agree").

[27] *Id.* at 326.

[28] *Id.* at 328.

[29] *Esparza-Rodriguez v. Holder*, 699 F.3d 821, 824 (5th Cir. 2012) (citation omitted), *overruled on other grounds by Mathis v. United States*, 136 S. Ct. 2243 (2016); *see Gomez-Perez*, 829 F.3d at 325, 328; TEX. PENAL CODE § 22.01(a)(1) (defining misdemeanor assault as "intentionally, knowingly, or recklessly caus[ing] bodily injury to another").

[30] TEX. PENAL CODE § 22.05(a).

[31] TEX. PENAL CODE § 1.07(a)(46).

[32] TEX. PENAL CODE § 22.

These varying degrees of harm are integral to our analysis. To define a CIMT, an assault statute must generally contain both (1) a "scienter element . . . requir[ing] . . . 'evil intent, depraved or vicious motive, or corrupt mind'" and (2) a conduct element requiring "a meaningful level of harm, which must be more than mere offensive touching."[33] Both elements—"the state of mind and the level of harm"—are critical to the CIMT inquiry "[b]ecause the term 'assault' captures 'a broad spectrum of misconduct, [including] relatively minor offenses, e.g., simple assault.'"[34] Thus, the BIA has determined that "in the context of assault crimes, . . . as the level of conscious behavior decreases, i.e., from intentional to reckless conduct, more serious resulting harm is required in order to find that the crime involves moral turpitude."[35]

The inverse relationship between scienter and harm explains our holding in *Gomez-Perez* and renders that case inapplicable here. As explained above, *Gomez-Perez* concerned misdemeanor assault, which includes reckless infliction of de minimis bodily injury.[36] Because its low degree of harm was not offset by a "more culpable mental state," misdemeanor assault was not a CIMT.[37] Deadly conduct, by contrast, demands an imminent threat of serious physical injury.[38] Because its potential harm is grave, no

---

[33] *Esparza-Rodriguez*, 699 F.3d at 824 (quoting *Matter of Solon*, 24 I. & N. Dec. 239, 241-42 (BIA 2007)).

[34] *Id.* (quoting *Matter of Fualaau*, 21 I. & N. Dec. 475, 477 (BIA 1996); *Matter of Solon*, 24 I. & N. Dec. at 242).

[35] *Solon*, 24 I. & N. Dec. at 242.

[36] *See Gomez-Perez*, 829 F.3d 323, 325, 328 (5th Cir. 2016).

[37] *Id.* at 328.

[38] *See* Tex. Penal Code §§ 1.07(a)(46), 22.05(a) (defining deadly conduct and serious bodily injury).

countervailing, heightened mens rea is necessary for deadly conduct to constitute a CIMT; recklessness suffices.[39]

Indeed, outside the context of misdemeanor assault, this court has not held that a mens rea of recklessness precludes an offense from being a CIMT. Instead, we have implied that recklessness can be a sufficiently culpable mental state.[40] This implication is consistent with a number of BIA decisions holding that some crimes committed recklessly are CIMTs.[41] Accordingly, we conclude that reckless offenses may constitute CIMTs.

**2**

Having so concluded, we turn to whether deadly conduct is a CIMT. Guiding our analysis are several decisions of our sister circuits holding that analogous statutes define CIMTs. For instance, in *Idy v. Holder*, the First Circuit determined that reckless conduct, defined in New Hampshire as "recklessly engag[ing] in conduct which places or may place another in danger of serious bodily injury," was "inherently" a CIMT because it entailed "reprehensible conduct" and an "actual awareness and a conscious disregard for a substantial and unjustifiable risk."[42] Similarly, in *Leal v.*

---

[39] *See Solon*, 24 I. & N. Dec. at 242 (describing, for purposes of discerning whether an assault crime constitutes a CIMT, the inverse relationship between the requisite degree of harm and scienter).

[40] *See Rodriguez-Castro v. Gonzales*, 427 F.3d 316, 323 (5th Cir. 2005) (observing that "[a]s a general rule, laws that authorize criminal punishment without proof that the offender intended *or recklessly disregarded* the potential consequences of his act do not define CIMTs" (emphasis added)).

[41] *See, e.g., Matter of Leal*, 26 I. & N. Dec. 20, 23 (BIA 2012); *Matter of Ruiz-Lopez*, 25 I. & N. Dec. 551, 554 (BIA 2011); *Matter of Torres-Varela*, 23 I. & N. Dec. 78, 89-90 (BIA 2001); *Matter of Franklin*, 20 I. & N. Dec. 867, 870 (BIA 1994); *Matter of Wojtkow*, 18 I. & N. Dec. 111, 112-13 (BIA 1981); *Matter of Medina*, 15 I. & N. Dec. 611, 613-14 (BIA 1976).

[42] 674 F.3d 111, 118-19 (1st Cir. 2012) (internal quotation marks omitted) (quoting N.H. Rev. Stat. Ann. § 631:3 (2011)).

*Holder*, the Ninth Circuit held that the BIA reasonably concluded that felony endangerment under Arizona law—which forbids "recklessly endangering another person with a substantial risk of imminent death or physical injury"—is a CIMT.[43]    Likewise, in *Keungne v. United States Attorney General*, the Eleventh Circuit concluded that the Georgia reckless conduct statute, which criminalized "consciously disregarding a substantial and unjustifiable risk that [an] act or omission will cause harm or endanger the safety of the other person," defined a CIMT.[44]    Finally, in *Knapik v. Ashcroft*, the Third Circuit agreed with the BIA's determination that New York's first degree reckless endangerment statute—which prohibited "engag[ing] in conduct which creates a grave risk of death to another person" "under circumstances evincing a depraved indifference to human life"—was a CIMT.[45]

Persuaded by this authority, we conclude that deadly conduct is categorically a CIMT.  Deadly conduct requires an offender to take actions creating "imminent danger" of serious physical injury, i.e., "permanent disfigurement" or "protracted" bodily "impairment," to another person.[46] This behavior is "reprehensible conduct"[47] that "shocks the public conscience as being inherently base, vile, or depraved, and contrary to the

---

[43] 771 F.3d 1140, 1144, 1148-49 (9th Cir. 2014) (quoting Ariz. Rev. Stat. Ann. § 13-1201(A) (2006)).

[44] 561 F.3d 1281, 1286 (11th Cir. 2009) (per curiam) (quoting Ga. Code Ann. § 16-5-60(b) (2006)).

[45] 384 F.3d 84, 86 n.1, 89 (3d Cir. 2004) (internal quotation marks omitted) (quoting N.Y. Penal Law § 120.25 (2000)).

[46] Tex. Penal Code §§ 1.07(a)(46), 22.05(a).

[47] *Matter of Leal*, 26 I. & N. Dec. 20, 21 (BIA 2012).

accepted rules of morality and the duties owed between persons."[48] Moreover, deadly conduct requires the offender to be "aware of but consciously disregard[]" the "substantial and unjustifiable risk" of injury his behavior poses.[49]    Such conscious disregard of grave harm indicates  a sufficiently "vicious motive or . . . corrupt mind."[50]  Deadly conduct meets the BIA's definition of moral turpitude and is categorically a CIMT.

Diaz Esparza counters that deadly conduct cannot be a CIMT because the offense encompasses acts creating a serious *risk* of harm, but not actual harm, and thus includes conduct that is not morally turpitudinous.  He first raised this assertion in a Rule 28j letter submitted after the close of briefing, then referred to it again during oral argument.  We ordinarily do not consider such belated contentions,[51] but even if we did, the claim fails.  Both the BIA and other courts of appeal have determined that offenses need not require actual infliction of physical harm to constitute CIMTs.[52]  We agree with their reasoning and conclude that "[w]ith regard to reckless acts, moral turpitude inheres in the conscious disregard of a substantial and unjustifiable risk of severe harm or death," such that Diaz Esparza's "good fortune in not

---

[48] *Villegas-Sarabia v. Sessions*, 874 F.3d 871, 877 (5th Cir. 2017) (internal quotation marks omitted) (quoting *Hyder v. Keisler*, 506 F.3d 388, 391 (5th Cir. 2007)).

[49] Tex. Penal Code § 6.03(c); *see* Tex. Penal Code § 22.05(a).

[50] *Villegas-Sarabia*, 874 F.3d at 878 (quoting *Hyder*, 506 F.3d at 391).

[51] *United States v. Huntsberry*, 956 F.3d 270, 282 n.4 (5th Cir. 2020) ("As a general rule, we do not consider arguments raised for the first time in a . . . 28j letter."); *see also United States v. Arellano-Banuelos*, 912 F.3d 862, 865 n.2 (5th Cir. 2019) ("'[W]e generally do *not* consider contentions raised for the first time at oral argument,'" as "[t]he proper time to closely examine the record and develop legal defenses is *before* the completion of briefing." (quoting *Martinez v. Mukasey*, 519 F.3d 532, 545 (5th Cir. 2008))).

[52] *See Matter of Leal*, 26 I. & N. Dec. 20, 25, 26 (BIA 2012); *Knapik v. Ashcroft*, 384 F.3d 84, 90 n.5 (3d Cir. 2004); *Leal v. Holder*, 771 F.3d 1140, 1146 (9th Cir. 2014); *Keungne v. U.S. Att'y Gen.*, 561 F.3d 1281, 1287 (11th Cir. 2009).

injuring or killing anyone does not change the quality of his actions."[53]  In sum, we hold that deadly conduct is categorically a CIMT; Diaz Esparza's arguments to the contrary are unavailing.

## B

Next, Diaz Esparza contends that his 2005 adjustment of status to lawful permanent residency is not an admission, so his convictions did not occur after he was admitted to the United States.  The BIA determined that under this court's precedent, Diaz Esparza's status adjustment does constitute an admission.  We review this determination de novo.[54]

Diaz Esparza was charged with removability under 8 U.S.C. § 1227(a)(2)(A)(ii), which permits the deportation of aliens convicted of two CIMTs "at any time after admission."[55]  Admission means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."[56]  This court has not squarely addressed whether an adjustment of status is an admission for purposes of § 1227(a)(2)(A)(ii), such that an individual is removable when he commits two CIMTs after adjusting his status.  We have, however, discussed the relationship between admissions and adjustments of status in the context of other statutory provisions, leading to ostensibly conflicting lines of precedent.

In one line of cases—which Diaz Esparza urges us to follow—this court has concluded that the term "admission" does not encompass adjustments of status to lawful permanent residency.  In *Marques v. Lynch*, an

---

[53] *Knapik*, 384 F.3d at 90 n.5; *see also Leal*, 26 I. & N. Dec. at 26; *Leal*, 771 F.3d at 1146; *Keungne*, 561 F.3d at 1287.

[54] *See Ramos-Torres v. Holder*, 637 F.3d 544, 547 (5th Cir. 2011).

[55] 8 U.S.C. § 1227(a)(2)(A)(ii).

[56] 8 U.S.C. § 1101(a)(13)(A).

alien lawfully entered on a non-immigrant visa, subsequently adjusted his status to that of a lawful permanent resident, then was charged with removability under 8 U.S.C. §§ 1227(a) and 1182(a)(7).[57]  These statutes deem removable "any immigrant at the time of application for admission" "who is not in possession of a . . . valid entry document."[58]  We held that "the documentation requirements of Section 1182(a)(7)"—which apply "only when an alien is making an *application for admission*"—"do not apply to an alien who was previously validly admitted as a nonimmigrant, who is residing in the United States, and who applies for an adjustment of status."[59]  In other words, we determined that in the context of § 1182(a)(7), an application for an adjustment of status did not "fit within the meaning of" an application for admission.[60]  This holding relied in part on our prior decision in *Martinez v. Mukasey*.[61]

*Martinez*, in turn, held that § 1182(h)—which declares ineligible for waiver of inadmissibility any alien "previously . . . lawfully admitted for permanent residence [who] . . . since the date of such admission . . . has been convicted of an aggravated felony"[62]—did not apply to an alien who was convicted of an aggravated felony after adjusting to lawful permanent resident status several years after his initial lawful entry as a non-immigrant

---

[57] 834 F.3d 549, 551, 553-54 (5th Cir. 2016).

[58] *Id.* at 553-54 (quoting 8 U.S.C. § 1182(a)(7)(A)(i)(I)) (quote at 554).

[59] *Id.* at 555, 562.

[60] *See id.* at 558-62 (internal quotation marks omitted) (first quoting 8 U.S.C. § 1104(a), which defines "application for admission" as used in § 1182(a)(7); and then quoting 8 U.S.C. § 1101(a)(13)(A) (quote at 558)).

[61] 519 F.3d 532 (5th Cir. 2008); *see Marques*, 834 F.3d at 560.

[62] 8 U.S.C. § 1182(h).

visitor.[63]  Discussing the statutory definition of "admission," we observed that "admission is the lawful *entry* of an alien after inspection, something quite different, obviously, from post-entry adjustment of status."[64]  Thus, both *Martinez* and *Marques* recognized a distinction between "admission" and "adjustment of status," at least for the purposes of §§ 1182(h) and 1182(a)(7), respectively.

In *Deus v. Holder*, however, this court perceived no such distinction. That decision concluded that an alien was "admitted" to the United States at the time she adjusted to lawful permanent resident status.[65]  Deus had illegally entered the United States as an infant with her mother, then later adjusted her status to that of a lawful permanent resident.[66]  After she was charged with removability, Deus sought to cancel her removal under 8 U.S.C. § 1229b(a), which permits cancellation for aliens who have, inter alia, "resided in the United States continuously for 7 years after having been admitted in any status."[67]  The BIA determined that Deus did not satisfy the statutory residence requirement, noting that "because Deus entered the U.S. illegally, she was not 'admitted in any status' until she adjusted her status to that of a lawful permanent resident."[68]  We agreed, observing that "[b]ecause Deus first entered the U.S. illegally, she was not 'admitted' as

---

[63] *Martinez*, 519 F.3d at 546.

[64] *Id.* at 544 (internal quotation marks omitted).

[65] *See Deus v. Holder*, 591 F.3d 807, 811 (5th Cir. 2009) (noting that the alien adjusted her status to that of a lawful permanent resident in 1996, and ultimately concluding that she was "'admitted' as that term is statutorily defined as requiring 'inspection and authorization by an immigration officer' . . . in 1996").

[66] *Id.* at 808.

[67] *Id.* (quoting 8 U.S.C. § 1229b(a)(2)).

[68] *Id.* at 810.

that term is statutorily defined as requiring 'inspection and authorization by an immigration officer' until she was admitted as a legal permanent resident in 1996."[69]

Our case law regarding the relationship between admissions and adjustments of status thus creates some tension. *Marques* and *Martinez* determined that the plain text of the INA unambiguously excludes adjustments of status from the definition of "admission."[70] *Deus*, however, concluded that an alien was admitted when she adjusted her status to that of a lawful permanent resident.[71]

These seemingly discordant holdings result from a key factual circumstance: the petitioner's manner of initial entry into the United States.[72] *Marques* and *Martinez* both dealt with aliens who first entered the country legally on non-immigrant visas.[73] Thus, these aliens' initial entries constituted "admissions," i.e., "lawful entr[ies] . . . after inspection and authorization by an immigration officer," by virtue of which they were

---

[69] *Id.* at 811.

[70] *See Marques v. Lynch*, 834 F.3d 549, 562 (5th Cir. 2016); *Martinez v. Mukasey*, 519 F.3d 532, 546 (5th Cir. 2008).

[71] *See Deus*, 591 F.3d at 811.

[72] *See Marques*, 834 F.3d at 562 ("We hold that . . . the documentation requirements of Section 1182(a)(7) do not apply to an alien *who was previously validly admitted as a nonimmigrant*, who is residing in the United States, and who applies for an adjustment of status." (emphasis added)); *Deus*, 591 F.3d at 811 ("In short, § 1229b(a)(2) only counts the period of continuous residence in the United States after the petitioner has 'been admitted in any status.' *Because Deus first entered the U.S. illegally*, she was not 'admitted' as that term is statutorily defined as requiring 'inspection and authorization by an immigration officer' until she was admitted as a legal permanent resident in 1996." (emphasis added)).

[73] *See Marques*, 834 F.3d at 551; *Martinez*, 519 F.3d at 536.

present in the United States.[74]  *Deus*, by contrast, concerned an alien who entered the United States "illegally without inspection" and thus was not "admitted" at the time of entry.[75]  Diaz Esparza's situation is analogous to that of Deus: he initially entered the country illegally, then later adjusted his status to that of a lawful permanent resident.[76]

In cases involving aliens who—like Deus and Diaz Esparza—enter the United States unlawfully then adjust to lawful permanent resident status, interpreting "admission" to exclude these status adjustments generates absurdity under certain provisions of the INA.  For Deus, interpreting "admission" to exclude adjustment of status would have left her with no relevant date by which to measure her length of presence in the United States and eligibility for cancellation of removal.  For Diaz Esparza, such interpretation would, as the Government points out, "create an absurd result whereby DHS could not remove an alien like [Diaz Esparza] merely because the initial entry into the country was unlawful, while DHS could remove an alien who lawfully entered the country."  Our case law has prefigured this absurd result and expressed a willingness to address it in future cases.[77]

Other circuits have confronted this potential absurdity and interpreted "admission" to encompass adjustments of status obtained by aliens who first entered illegally.  For example, in *Estrada-Hernandez v.*

---

[74] 8 U.S.C. § 1101(a)(13)(A) (defining admission).

[75] *Deus*, 591 F.3d at 808.

[76] *See id.* at 808.

[77] *See Marques*, 834 F.3d at 562 n.4 ("The Government argues that this conclusion, if extended to every provision in the INA, would create absurd results.  We find ourselves bound by the reasoning of *Martinez*, which as we have noted here also faced arguments about absurd consequences.  *The ramifications of this opinion can be addressed if they arise in subsequent cases.*" (emphasis added)).

*Lynch*, the Seventh Circuit rejected an alien's argument that he was not removable under § 1227(a)(2)(A)(iii)—which permits removal of aliens who commit an aggravated felony after admission—because "his adjustment of status, which occurred after he had entered the United States unlawfully, d[id] not qualify as an 'admission.'"[78]  The court held that, "for an alien who had entered the United States illegally, an adjustment of status *is* an 'admission' for purpose of § 1227(a)(2)(A)(iii) because the adjustment of status is the first point at which that individual is lawfully in the United States.  Otherwise, illegal entrants would be exempt from removal and would, paradoxically, enjoy greater rights than lawful immigrants."[79]

Likewise, in *Ocampo-Duran v. Ashcroft*, the Ninth Circuit rejected the argument that an alien who entered without inspection but later adjusted to lawful permanent resident status had not been "admitted," and was thus not removable, under § 1227(a)(2)(A)(iii).[80]  The court disagreed with the alien's "overly-narrow interpretation of" the statute, observing that he failed to explain "why Congress would create a loophole in the removal laws for aliens who enter the country without inspection, adjust their status, and then commit aggravated felonies."[81]  Accordingly, the Ninth Circuit held that the alien had been admitted at the time he adjusted his status and thus could be removed.[82]  The Fourth Circuit has indicated its receptivity to a similar approach.[83]  In sum, other courts have recognized that the manner in which

---

[78] 819 F.3d 324, 328 (7th Cir. 2016) (per curiam).

[79] *Id.* (internal citation omitted).

[80] 254 F.3d 1133, 1134-35 (9th Cir. 2001).

[81] *Id.* at 1135.

[82] *Id.* at 1134-35.

[83] *See Leiba v. Holder*, 699 F.3d 346, 354 (4th Cir. 2012) (recognizing that "for aliens such as [the petitioner]," "who never entered this country legally but who ha[ve]

No. 19-60699

an alien initially entered the United States may inform judicial analysis regarding whether "admission" includes adjustments of status under various provisions of immigration law.[84]

Such context-specific analysis was implicit to our holding in *Deus*,[85] and we extend it here.  Interpreting "admission" to exclude Diaz Esparza's status adjustment would leave him with no relevant date of admission by which to assess his removability and thus preclude him from being removed under § 1227(a)(2)(A)(ii).  Put differently, this interpretation creates an absurdity whereby DHS could not remove aliens who enter unlawfully, adjust their statuses, then commit multiple CIMTs, but could remove aliens who commit multiple CIMTs after entering the country lawfully.  To avoid this absurd result, we conclude that, as in *Deus*, Diaz Esparza was "admitted" when he adjusted his status to that of a lawful permanent resident in 2005.[86]

Diaz Esparza contests this conclusion, arguing that he was "admitted," i.e., he lawfully entered the United States after inspection by an immigration officer, on February 9, 2019.  However, even assuming *arguendo*

---

adjusted to LPR status," "it is arguable that the date of their status adjustment should be used as a proxy for their date of admission to avoid an absurd result" under § 1227(a)(2)(A)(iii)).

[84] *See, e.g.*, *Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1055 (9th Cir. 2014) (BERZON, J., concurring) ("We must apply a plain words interpretation to the statutory definition of 'admission' and 'admitted' in the INA when we can sensibly do so. . . . In some instances, however, such as where there has been *no* admission of the sort contemplated by the statute, yet the context requires some trigger date by which to measure a later event, or where the result of treating an adjustment of status as if there had been no admission would be absurd, adjustment of status must be treated as admission.").

[85] *See Deus v. Holder*, 591 F.3d 807, 811 (5th Cir. 2009) (explaining that "[b]ecause Deus first entered the U.S. illegally, she was not 'admitted' as that term is statutorily defined as requiring 'inspection and authorization by an immigration officer' until she was admitted as a legal permanent resident in 1996").

[86] *See id.*

that Diaz Esparza was admitted in 2019, this admission is irrelevant to the present removal proceeding. The BIA has determined that when an alien has multiple dates of admission, the operative date for determining removability is "the date of the admission by virtue of which the alien was present in the United States when he committed his crime," which—for aliens who initially entered without inspection—includes the date of adjustment to lawful permanent resident status.[87] Diaz Esparza was convicted of deadly conduct in 2013 and evading arrest in 2014. Thus, even if Diaz Esparza *was* admitted in February 2019, he was not present in the United States by virtue of this admission when he committed his crimes; hence this admission is not pertinent to his removability.

In sum, we hold that Diaz Esparza's 2005 adjustment to lawful permanent resident status constitutes the operative admission for purposes of this removal proceeding under § 1227(a)(2)(A)(ii). Because his convictions for deadly conduct and evading arrest occurred after he adjusted his status, Diaz Esparza has been convicted of two CIMTs after admission to the United States.[88]

*       *       *

As explained above, res judicata does not bar this removal proceeding, deadly conduct is categorically a CIMT, and Diaz Esparza was admitted to the United States when he adjusted his status to that of a lawful permanent resident. Accordingly, we **DISMISS** the petition for review.

---

[87] *Matter of Alyazji*, 25 I. & N. Dec. 397, 406, 408 & n.9 (BIA 2011) (quote at 406).

[88] *See* 8 U.S.C. § 1227(a)(2)(A)(ii).